No. 24-1766
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

## DEREK CHAPMAN,

*Plaintiff-Appellant*,

**v.**

## MARYLAND DEPARTMENT OF STATE POLICE
## OFFICE OF THE STATE FIRE MARSHAL,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the District of Maryland
(A. David Copperthite, Magistrate Judge)
_____

## BRIEF OF APPELLEE
_____

ANTHONY G. BROWN
Attorney General of Maryland

PHILLIP M. PICKUS
KYLE A. ASHE
Assistant Attorneys General
Office of the Attorney General
1201 Reisterstown Road, Bldg. A
Pikesville, Maryland 21208
(410) 653-4293 (telephone)
phillip.pickus@maryland.gov
kyle.ashe@maryland.gov

March 21, 2025          *Attorneys for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1766__      Caption: __Derek Chapman v. Maryland State Police__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Maryland State Police__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                       ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Phillip M. Pickus                    Date:   September 13, 2024

Counsel for: appellee Maryland State Police

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

QUESTIONS PRESENTED FOR REVIEW ...............................................1

STATEMENT OF THE CASE ...................................................................1

    The Office of the State Fire Marshal and Its Primary Duties.........................2

    Mr. Chapman's Chronic Issue with Overdue Reports ...................................3

    The Internal Affairs Investigation ................................................................9

    Procedural History .......................................................................................12

SUMMARY OF ARGUMENT................................................................14

ARGUMENT ..........................................................................................16

I.    THIS COURT REVIEWS THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT FOR LEGAL ERROR....................................................................16

II.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT MR. CHAPMAN FAILED TO ESTABLISH PRIMA FACIE CASES OF DISCRIMINATION AND RETALIATION. ..............................................................................16

    A.    The District Court Correctly Concluded That Mr. Chapman Failed to Establish a Prima Facie Case of Race or Color Discrimination Because He Cannot Show Satisfactory Job Performance or That He was Subjected to Disparate Treatment........18

        1.    The District Court Correctly Found That Mr. Chapman Failed to Demonstrate Satisfactory Job Performance Because He Failed to Satisfy His Employer's Legitimate Expectations. ..........................................................................19

        2.    The District Court Correctly Found That Mr. Chapman Failed to Sufficiently Identify Similarly Situated Comparators to Support His Disparate Treatment Claim.........23

    B.    The District Court Correctly Concluded That Mr. Chapman Failed to Establish a Prima Facie Case of Retaliation Because He

i

Cannot Show That the Office's Corrective Actions Are Causally Connected to His Protected Activity. ................................................... 26

III.    EVEN IF MR. CHAPMAN COULD ESTABLISH PRIMA FACIE DISCRIMINATION AND RETALIATION CLAIMS, THE DISTRICT COURT CORRECTLY HELD THAT HE FAILED TO SHOW THAT THE OFFICE'S LEGITIMATE, NON-DISCRIMINATORY REASONS FOR ITS ACTIONS WERE PRETEXTUAL. ................................................................................... 31

CONCLUSION ....................................................................... 36

# TABLE OF AUTHORITIES

Page

## Cases

*Alberti v. Rector and Visitors of the University of Virginia*,
65 F.4th 151 (4th Cir. 2023). ...............................................................27, 32

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)....................................................16

*Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985). ................................................ 16, 35

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2003). ........................................................... 25, 35

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015). ..................26

*Bullock v. Kendall*, No. 21-2111, 2022 WL 2828221 (4th Cir. July 20, 2022). .....30

*Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994). ........................................................36

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001). ........................................28

*Cole v. Fam. Dollar Stores of Maryland, Inc.*,
811 F. App'x 168 (4th Cir. 2020). ...............................................................32

*Coleman v. Md. Court of Appeals*, 626 F3d 187 (4th Cir. 2010). .................... 18, 26

*Cook v. CSX Transp. Corp.*, 988 F.2d 507 (4th Cir. 1993). ...................................23

*Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707 (4th Cir. 2024)..........23

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013)...............................................16

*Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716 (4th Cir. 2002). .......................32

*E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001). .........................32

*English v. Clarke*, 90 F.4th 636 (4th Cir. 2024) ....................................................16

*Evans v. Technologies Applications & Serv. Co.*,
80 F.3d 954 (4th Cir. 1996). ..................................................................... 16, 35

*Francis v. Booz, Allen, & Hamilton, Inc.*, 452 F.3d 299 (4th Cir. 2006). ........ 30, 35

iii

*Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir. 2000)........................................19

*Haynes v. Waste Connections, Inc.*, 922 F.3d 219 (4th Cir. 2019). ................ passim

*Haywood v. Locke*, 387 F. App'x 355 (4th Cir. 2010). ...........................................23

*Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361 (4th Cir. 2005). ...........29

*Johnson v. Merrell Dow Pharms., Inc.*, 965 F.2d 31 (5th Cir.1992)......................19

*Johnson v. United Parcel Service, Inc.* 839 Fed.Appx 781 (4th Cir. 2021)..... 17, 31

*Laurent-Workman v. Wormuth*, 54 F.4th 201 (4th Cir. 2022)......................... 28, 29

*Lettieri v. Equant Inc.*,478 F.3d 640 (4th Cir. 2007). ..............................................29

*Lightner v. City of Wilmington*, N.C., 545 F.3d 260 (4th Cir. 2008)............... 22, 23

*Mackey v. Shalaba*, 360 F.3d 463 (4th Cir. 2004). ...................................................31

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). ....................................17

*McDougald v. Quad/Graphics Mktg., LLC*, 744 F. App'x 839 (4th Cir. 2018)......31

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289 (4th Cir. 2010) ............17

*Mitchell v. Data Gen. Corp*., 12 F.3d 1310, (4th Cir. 1993). ..................................16

*O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542 (4th Cir.1995). ......21

*Ortiz v. Baltimore Police Dep't*,
No. CV SAG-22-1396, 2024 WL 4287999 (D. Md. Sept. 25, 2024).....................35

*Perry v. Kappos*, 489 F. App'x 637 (4th Cir. 2012). ...............................................35

*Phillips v. New Millennium Bldg. Sys., LLC*, No. 20-2095,
2022 WL 2188405 (4th Cir. June 17, 2022). .................................................... 27, 32

*Price v. Thompson*, 380 F.3d 209 (4th Cir. 2004). ..................................................32

*Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111 (4th Cir. 2021)............. 27, 28, 29

*Smith v. Flax*, 618 F.2d 1062 (4th Cir. 1980). ........................................................22

*Spencer v. Virginia State University*, 919 F.3d 199 (4th Cir. 2019). ......................26

*Stanton v. Elliott*, 25 F.4th 227 (4th Cir. 2022) ....................................16

*Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745 (4th Cir. 2017). ........ 23, 25

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981)...................................17

*Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001) ........................................18

*Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244 (4th Cir. 2025). ..............17

*Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006). ...................................21

*Williams v. Giant Food Inc.*, 370 F.3d 423 (4th Cir. 2004)............................. 25, 35

## Statutes

29 U.S.C. §§ 2601 – 2654. ......................................................................12

42 U.S.C. § 1981. ....................................................................................12

42 U.S.C. § 1983. ....................................................................................12

42 U.S.C. §§ 2000e – 2000e-17. ...............................................................2

Md. Code Ann., Pub. Safety § 6-301 (LexisNexis 2022)...........................2

Md. Code Ann., Pub. Safety § 6-302 (LexisNexis 2022)...........................2

Md. Code Ann., Pub. Safety § 6-309 (LexisNexis 2022)...........................2

Md. Code Ann., State Gov't §§ 20-601–20-611 (LexisNexis 2024). ......................12

## Rules

Fed. R. Civ. P. 56. ...................................................................................16

## QUESTIONS PRESENTED FOR REVIEW

1.     Did the district court correctly conclude that Derek Chapman could not establish a prima facie discrimination case based on (a) his repeated failure to satisfy his employer's expectations, and (b) his inability to identify other employees outside of his protected class who engaged in similar misconduct but were treated more favorably?

2.     Did the district court correctly conclude that Mr. Chapman failed to establish a prima facie retaliation case, when his employer had already begun to take progressive disciplinary measures against him before he engaged in any protected activity, and he could not show that his protected activity and his employer's alleged adverse action were causally connected?

3.     Did the district court correctly conclude that Mr. Chapman failed to establish that his employer's legitimate, non-discriminatory reasons behind its corrective action against him were pretextual in light of the well-documented history of his performance deficiencies?

## STATEMENT OF THE CASE

This is an appeal of the United States District Court for the District of Maryland's decision to enter summary judgment in favor of the Office of the State Fire Marshal ("the Office") as to appellant Derek Chapman's Title VII discrimination and retaliation claims against the Office. (J.A. 441-453); *see* 42

1

U.S.C. §§ 2000e – 2000e-17 (LexisNexis 1992) ("Title VII"). Mr. Chapman claims that the Office discriminated against him based on his color and his race, and that the Office retaliated against him for voicing his concerns about race relations in the workplace and for filing a fair practices complaint. (J.A. 6-34.)

### The Office of the State Fire Marshal and Its Primary Duties.

The Office of State Fire Marshal is a statutorily-created, paramilitary organization under the Department of State Police that enforces fire- and arson-related laws in Maryland and investigates the origin and circumstances of fires and explosions. *See* Md. Code Ann., Pub. Safety §§ 6-301, 6-302, 6-309 (LexisNexis 2022). The State Fire Marshal oversees the Office, which is geographically divided into seven smaller regions throughout the state. Pub. Safety § 6-302; (J.A. 76, J.A. 80.) The State Fire Marshal's second-in-command is the Chief Deputy Fire Marshal, and each region is overseen by its first-line supervisors: the Deputy Chief Fire Marshals. (J.A. 76, J.A. 78.) The starting rank in the Office is that of a Deputy Fire Marshal. (J.A. 74.) All Deputy Fire Marshals in the Office are sworn police officers. (J.A. 74.)

One of the primary duties of fire marshals at the Office is to complete and submit "fire origin reports," which document whether the cause of a particular fire or explosion was intentional or accidental. (J.A. 81, J.A. 109.) These reports play a

crucial role in informing the work of prosecutors, investigators, and insurance professionals alike.  (J.A. 82-85, J.A. 109.)

### Mr. Chapman's Chronic Issue with Overdue Reports

In 1998, the Office hired Mr. Chapman as a Deputy Fire Marshal and assigned him to the North East Regional Office, which is more commonly referred to as "NERO."  (J.A. 72-73, J.A. 76.)  Brian Geraci was the State Fire Marshal during the relevant time of Mr. Chapman's employment.  (J.A. 77.)  Greg Der became the Chief Deputy Fire Marshal in 2017.  (J.A. 88.)

The Office promoted Mr. Chapman to Deputy Chief Fire Marshal of NERO in June of 2018.  (J.A. 78-79.)  Notably, Mr. Chapman maintained a backlog of overdue fire origin reports leading up to his promotion.  (J.A. 92-93.)  Since the Office holds its supervisors to a higher standard than non-supervisors, this came up as a concern during Mr. Chapman's promotional interview, because he would soon be responsible for the timely submission of his subordinates' reports, along with his own. (J.A. 91-93, J.A. 110.)  Mr. Chapman responded by assuring his command that he would take action to see that the number of delinquent reports was reduced.  (J.A. 91-93.)

But Mr. Chapman did not keep this promise.  In February of 2018, Mr. Chapman still had 41 incomplete reports and NERO had a total of 261 late or incomplete reports.  (J.A. 112.)  By September of 2018, the backlog had persisted

3

for so long that Chief Der asked Mr. Chapman to put together a plan to help Mr. Chapman and his region catch up on the significant number of delinquent reports. (J.A. 113.)  In particular, Chief Der said "if we can't catch up, we may need to assign folks to desk duty to [help]."[1]  (J.A. 113.)  The issue, however, did not resolve because, by November of 2018, NERO still had 143 incomplete cases.  (J.A. 114.)

Mr. Chapman's inability to manage his and his subordinates' backlogs continued to plague him into 2019 and throughout his tenure as the Deputy Chief Fire Marshal of NERO.  In June, September, and October of 2019, Mr. Chapman's supervisors repeatedly expressed their concerns to him about the high number of late or incomplete reports in NERO.  (J.A. 119-130.)  At one point, Chief Der even requested to meet with all the members of the region to brainstorm ways to help fix the issue.  (J.A. 119-130.)

Additionally, during the height of the COVID-19 Pandemic in 2020, State Fire Marshal Geraci instructed all fire marshals to use their telework time to catch up on late or open reports.  Just before the shutdown, Mr. Chapman circulated an email asking members of the Office to share in celebrating Black History Month.

---

[1] Temporarily reassigning a fire marshal to allow them to focus on reducing their backlogged reports is not a new concept for the Office.  For example, in 2019, the Office temporarily reassigned Deputy Fire Marshal Brian Quick from NERO to the Western Regional Office, specifically to focus on submitting his overdue reports. (J.A. 110.)  He returned to his unit as soon as he did.  (J.A. 110.)

4

(J.A 134-35.)  Fire Marshal Geraci and Chief Der both thanked Mr. Chapman for sharing the email and recognizing "[the] folks who make a tremendous contribution to this agency." (J.A. 136-37.)  Even with the extra time at home during the shutdown, Mr. Chapman still could not meet his required metrics, and his backlog woes continued well into the following year.  (J.A. 94.)

In February of 2021, Chief Der emailed Mr. Chapman and two other Deputy Chief Fire Marshals, Jason Mowbray and John Nelson, requesting that they complete their overdue reports.  (J.A. 138-46, J.A. 186-87.)  Notably, Deputy Chief Mowbray only had one late report, which he submitted the next day.  (J.A. 110, J.A. 138-146, J.A. 186-187.)  Deputy Chief Nelson had 13 late reports.  But he had actually completed those reports, which were merely awaiting supervisory approval.  When Chief Der inquired with Deputy Chief Nelson about the reports, Deputy Chief Nelson resubmitted them within two weeks so they could be signed and marked as complete.  (J.A. 138-146, J.A. 186-187, J.A. 248.)  Neither deputy chief ever had a backlog of more than five reports, or for longer than three months.  (J.A. 110, J.A. 249.)  Mr. Chapman, on the other hand, never responded to Chief Der's email.  (J.A. 186-187.)

On February 18, 2021, Chief Der followed up by email with Mr. Chapman regarding a conversation they had about his backlog.  (J.A. 147-148.)  Chief Der offered Mr. Chapman a compromise by only requiring him to submit five reports

every two weeks, stating "I'm not asking you to complete them all at once, just a few at a time." (J.A. 147-148.)  As a start, Chief Der identified five specific reports for Mr. Chapman to complete by March 4, 2021.  (J.A. 147-148.)  Chief Der even sent a reminder email on March 2, which Mr. Chapman acknowledged.  (J.A. 149.)

By March 4, 2021, however, Mr. Chapman had only submitted three of the five reports Chief Der requested.  Chief Der met with Mr. Chapman the next day to discuss the issue, which he memorialized in a written order to Mr. Chapman on March 16, 2021.  (J.A. 150-153.)  The order noted that Chief Der and Mr. Chapman mutually agreed that Mr. Chapman would submit ten late reports per month, with the first deadline beginning at the end of April.  (J.A. 151.)  The order also emphasized that reducing the number of late reports was of the "utmost importance" and made clear that failing to complete the reports could "result in further action." (J.A. 151.)  Chief Der scheduled a meeting with the members of NERO the following week to discuss the region's backlog.  (J.A. 154.)

On June 8, 2021, Fire Marshal Geraci issued a General Order regarding open reports, stating that the Chief Deputy would provide a list of overdue reports and that members were to submit at least five of those reports per month, or face the possibility of "progressive disciplinary action." (J.A. 98, J.A. 107.)  Mr. Chapman emailed his subordinates at NERO that same day, advising them to direct any information requests from Chief Der to him.  (J.A. 156.)

By June 16, 2021, Mr. Chapman's region had 239 delinquent reports, which was 173 more than the next-highest-reporting region. (J.A. 157-158.) As a result, the Office temporarily reassigned Mr. Chapman to headquarters so he could focus full-time on reducing the backlog.[2] (J.A. 157-158.) Mr. Chapman filed a fair practices complaint on June 15, 2021—the day before he was temporarily reassigned— because he "felt it was coming." (J.A. 230, J.A. 253-261.) And, while Mr. Chapman's complaint does not mention his reassignment, he testified at his deposition that the reassignment was the reason he filed the complaint. (J.A. 101.)

In July of 2021, and as part of Mr. Chapman's performance evaluation, Chief Der listed Mr. Chapman's continued failure to finish his overdue reports as an area of concern, noting that some of his open reports were from years ago. (J.A. 160.) Mr. Chapman refused to sign his evaluation, and he continued to struggle with his backlog of reports throughout the month of July. (J.A. 161, J.A. 168.)

---

[2] The Office replaced Mr. Chapman as the head of NERO with Deputy Chief Fire Marshal Dexter Hodges, who is also an African American male. (J.A. 102, J.A. 244.) In June of 2021, Deputy Chief Hodges inherited NERO's 239 overdue reports from Mr. Chapman and, by December of 2021, he managed to reduce the number of NERO's outstanding reports to 38. (J.A. 245.) Additionally, various deputy fire marshals in NERO came forward to Deputy Chief Hodges to report that some of their reports had actually already been completed and submitted to Mr. Chapman during his tenure, and that those reports were showing as "outstanding" simply because Mr. Chapman had not reviewed and approved them yet. (J.A. 245.)

On August 11, 2021, Chief Der issued Mr. Chapman a written personnel counseling for failing to file his late reports and meet three separate deadlines. (J.A. 168-169.) The counseling explicitly noted that "further occurrences . . . [would] continue to follow progressive disciplinary procedures." (J.A. 168-169.) The counseling form allocates space for the reprimanded employee to offer statements or suggestions on how to correct the problem, but Mr. Chapman left that area blank and only provided his signature. (J.A. 168-169.)

The following week, on August 16, 2021, Chief Der filed a disciplinary complaint against Mr. Chapman for failing to obey direct orders, and for not only failing to submit his own late reports but also for failing to ensure his subordinates did the same. (J.A. 183.) That same day—and only twenty minutes later—Mr. Chapman submitted his own discrimination and harassment complaint against Chief Der, asserting that Chief Der "lied and misrepresented facts." (J.A. 183-184.)

Mr. Chapman continued to struggle with the backlog of reports up until October of 2021. And even when Mr. Chapman did submit reports, issues arose. In one particular instance, Mr. Chapman submitted two reports that Chief Der never specifically assigned, and which also provided "no real origin and cause documentation." (J.A. 170-173.) When Chief Der explained this to Mr. Chapman, he responded by calling Chief Der's remarks "condescending and without merit." (J.A. 170-173.)

8

Due to his repeated failure to meet departmental deadlines and expectations relating to the backlogged reports, the Office suspended Mr. Chapman, with pay, on October 12, 2021. (J.A. 174-175.) Later that day, members from the Office and the Department of State Police served Mr. Chapman at his residence with suspension papers and collected his badge, gun, and agency vehicle. (J.A. 176-177.) During this time, Mr. Chapman commented that "it was all good until Greg Der," described Chief Der as a "troll with little man syndrome," told those serving him to "be truthful about what was happening," and remarked that "[all this] would come back to bite [them] later." (J.A. 99-100, J.A. 176-177.)

**The Internal Affairs Investigation**

The Office's Internal Affairs Division merged Chief Der's and Mr. Chapman's disciplinary complaints together. (J.A. 183-184.) Both Mr. Chapman and Chief Der were separately interviewed and interrogated as part of the consolidated investigation. (J.A. 191-205.)

Significantly, Mr. Chapman admitted during the investigation that he did not complete the overdue reports and acknowledged that this violated the Office's manual. (J.A. 221, J.A. 223.) In fact, when asked, "just to be clear, you didn't do the reports," Mr. Chapman unequivocally replied, "[n]o, I didn't do the reports." (J.A. 221, J.A. 223.) Mr. Chapman also conceded that, although he filed a discrimination complaint against Fire Marshal Geraci and Chief Der, he does not

9

believe either acted with racial animus, and that he attributed it to more of a "personality conflict." (J.A. 197-198, J.A. 229, J.A. 233-234.)

As part of its investigation, the Internal Affairs Division compiled the below table based on the number of delinquent reports throughout the Office. (J.A. 207.) The top nine rows provide an overview of late reports that each NERO member had from February of 2018 until June of 2021. The bottom seven rows (not including the "Total") present a synopsis of late reports for each region in June of 2021. The "Total" in the last row represents the total number of overdue reports that NERO had as a whole, starting from February of 2018 to March of 2021.

| The OSFM | Feb. 2018 | Aug. 2018 | June 2019 | Sept. 2019 | Oct. 2019 | Mar. 2021 | June 2021 | Average Reports |
|---|---|---|---|---|---|---|---|---|
| Chapman | 41 | 43 | 36 | 40 | 52 | 40 | | 42 |
| Alkire | 6 | 15 | 25 | 23 | 25 | 51 | | 24 |
| Dell | 33 | 44 | 44 | 44 | 41 | 51 | | 43 |
| Ewing | 74 | 70 | 54 | 53 | 58 | 66 | | 63 |
| Quick | 31 | 40 | 39 | 34 | WRO | 44 | | 38 |
| Raia | 22 | 30 | 21 | 14 | 19 | 21 | | 18 |
| Selvage | 54 | 47 | 63 | 61 | 60 | 62 | | 58 |
| Yednak | | | | | | 37 | | 37 |
| Pennock | | | | | | 43 | | 43 |
| LERO | | | | | | | 43 | |
| NERO | | | | | | | **239** | |
| SRO | | | | | | | 45 | |
| UERO | | | | | | | 22 | |
| WRO | | | | | | | 66 | |
| BS | | | | | | | 11 | |
| HQ | | | | | | | 7 | |
| Total | **261** | **289** | **282** | **269** | **255** | **415** | | **Avg-41** |

Based on the above table, the internal investigation found that, in June of 2019, NERO had 173 more overdue reports than any other region in the Office, and that NERO's 239 delinquent reports totaled more than the sum of all the other regions' totals combined. Further investigation also revealed that, by November 12, 2021, Mr. Chapman was the only regional commander with open reports, and that 27 of his 40 delinquent reports dated as far back as 2017. (J.A. 189-190.)

Consequently, the Internal Affairs Division sustained Mr. Chapman's neglect of duty and failure to supervise charges based on the late reports, and it sustained Mr. Chapman's insubordination charge based on his failure to obey Chief Der's written orders. (J.A. 208-210.) The Internal Affairs Division also concluded that Mr. Chapman's false statement and discrimination/harassment charges against Chief Der were "non-sustained" and unfounded, respectively. (J.A. 210-212.)

On March 18, 2022, Mr. Chapman waived his right to an administrative hearing and pleaded guilty to all three disciplinary charges. (J.A. 237-242.) As punishment, he accepted a written reprimand for his neglect of duty, a one-day loss-of-leave for his failure-to-supervise, and two days loss-of-leave for his insubordination. (J.A. 237-242.) The Office restored Chapman to full duty on

11

December 1, 2021, but he never fully caught up on his overdue reports until two years later.[3]  (J.A. 110, J.A. 178.)

**Procedural History**

On February 7, 2022, Mr. Chapman filed a charge of discrimination, based on race and retaliation, with the Maryland Commission on Civil Rights ("MCCR") and Employee Equal Opportunity Commission ("EEOC").  (J.A. 262-264.)  On June 16, 2022, he amended his charge to include a discrimination claim based on color.  (J.A. 265-267.)  The EEOC issued Mr. Chapman's right-to-sue letter on November 22, 2022.  (J.A. 8.)

Mr. Chapman filed suit on February 17, 2023, asserting Title VII claims of race discrimination, color discrimination, and retaliation (Counts I-III), a claim based on the Maryland Fair Employment Practices Act (Count IV), a retaliation claim under the Family and Medical Leave Act (Count V), and a claim based on violations of 42 U.S.C. § 1981 and § 1983 (Count VI).  (J.A. 6-34.)  The Office filed a motion to dismiss (ECF No. 6), which the district court partially granted and denied, allowing only Counts I through III to proceed, (ECF No. 15).[4]

---

[3] Contrary to Mr. Chapman's representations, the Office never terminated him.  He is still currently employed at the Office of the State Fire Marshal.

[4] Although not mentioned in his brief, it is worth noting that Mr. Chapman also identifies two other deputy chief fire marshals in his complaint as possible comparators: Deputy Chiefs Matthew Stevens and Sander Cohen.  (J.A. 18.)  Deputy Chief Stevens was promoted in 2013, and, with the exception of one case that

At the close of discovery, the Office moved for summary judgment on all counts. (J.A. 35-66.) The district court dismissed the remaining claims and entered summary judgment in the Office's favor. (J.A. 453.) Specifically, the district court concluded that Mr. Chapman could not establish a prima facie case of race or color discrimination because he "failed to show that he was satisfactorily performing his job and that other employees outside of his protected classes were treated more favorably . . . ." (J.A. 449.) The district court also concluded that Mr. Chapman's race and color discrimination claims failed because he could not demonstrate that the Office's proffered reasons behind its corrective actions were pretextual. (J.A. 450.) Regarding Mr. Chapman's retaliation claim, the district court found the nexus between Mr. Chapman's protected activity and his discipline too attenuated to support a causal link. (J.A. 451.) Likewise, the district court held that, even if Mr. Chapman could establish a prima facie retaliation case, he still could not refute the Office's legitimate non-discriminatory reasons enough to show a pretext. (J.A. 451.) This appeal followed.

---

required additional investigation, he never had a backlog that lasted over three months. (J.A. 251.) Although Deputy Chief Stevens had one subordinate who had a backlog of nine or ten reports in 2021, the issue was quickly resolved with a verbal reminder. (J.A. 252.) Also, Deputy Chief Stevens actually supervised Deputy Chief Cohen. (J.A. 252.) And in 2015 and 2016, Deputy Chief Cohen never had more than 6 overdue reports, and he submitted overdue reports whenever requested. (J.A. 252.) Unfortunately, Deputy Chief Cohen died soon after Chief Der arrived in 2017, so he was not subject to the same supervision as Mr. Chapman.

## SUMMARY OF ARGUMENT

For years, Mr. Chapman failed to ensure that he and his subordinates timely submitted their fire origin reports, which he readily admits is an essential function he neglected to perform. This dereliction became so severe and persisted for so long that, at one point, Mr. Chapman and his region maintained a backlog of delinquent reports that totaled more than all the other regions combined. Nevertheless, despite numerous efforts by Mr. Chapman's supervisors to help get him back on track, the Office was eventually forced to discipline Mr. Chapman's continued failure to meet the Office's basic expectations of a fire marshal and of a supervisor. Consequently, the district court correctly concluded that Mr. Chapman failed to establish a prima facie case of discrimination because he (1) cannot show satisfactory job performance, and (2) cannot identify any similarly-situated comparators who engaged in misconduct that was as serious as his, but that the Office treated more favorably.

Next, although Mr. Chapman asserts that the Office retaliated against him for voicing his concerns over race relations at a meeting on March 21, 2021, and for filing a fair practices complaint on June 15, 2021, the Office had begun to take progressive corrective and disciplinary measures against him for his backlogged reports in 2018. Mr. Chapman also admitted that he filed his fair practices complaint because he believed a transfer was imminent. The Office, however, only temporarily

14

reassigned Mr. Chapman to focus on reducing his backlog, which occurred three months after Mr. Chapman claims he engaged in a protected activity. As a result, the district court correctly concluded that the Office's corrective measures taken against Mr. Chapman were not retaliatory, and that a three-month lapse between Mr. Chapman's protected activity and his reassignment was too attenuated to show a causal connection. Thus, the district court correctly ruled that Mr. Chapman failed to establish a prima facie case of retaliation.

Finally, Mr. Chapman's history of overdue reports is well-documented, and he made several admissions that severely undercut his claims in this case. Nevertheless, Mr. Chapman continues to summarily claim that the Office engaged in discrimination and retaliation. But self-serving, uncorroborated assertions are not enough to refute the legitimate, non-discriminatory justifications the Office provided in support of its actions. Accordingly, the district court correctly held that, even if *arguendo* Mr. Chapman could establish prima facie cases of discrimination or retaliation, he failed to show that the Office's proffered reasons behind its corrective action were pretextual.

# ARGUMENT

## I. THIS COURT REVIEWS THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT FOR LEGAL ERROR.

Appellate review of summary judgment decisions is *de novo*. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *English v. Clarke*, 90 F.4th 636, 645 (4th Cir. 2024); Fed. R. Civ. P. 56(a). At summary judgment, however, the non-moving party cannot create a genuine issue of fact by pointing to a scintilla of evidence or building one inference upon another. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Conclusory allegations, speculation, hearsay, and self-serving, uncorroborated assertions simply will not suffice. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *see also Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Rather, a plaintiff must provide enough admissible evidence to "carry the burden of proof" at trial. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993); *Anderson*, 477 U.S. at 252.

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT MR. CHAPMAN FAILED TO ESTABLISH PRIMA FACIE CASES OF DISCRIMINATION AND RETALIATION.

The undisputed facts in this case establish that Mr. Chapman's discrimination and retaliation claims cannot survive summary judgment as a matter of law. Mr.

16

Chapman had two avenues through which he could have sought to establish his claims: either (1) through direct evidence of retaliation and discrimination; or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025).  Since Mr. Chapman has failed to produce any direct evidence of discrimination or retaliation in this case, he must proceed under the *McDonnell Douglas* analysis.[5]  Accordingly, Mr. Chapman must first establish *prima facie* cases of discrimination and retaliation, and then prove that any legitimate, non-discriminatory justification the Office offers for its actions is pretextual.  *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).  Here, Mr. Chapman fails in both respects, and the district court correctly granted summary judgment in the Office's favor.

---

[5] Nor could Mr. Chapman rely on direct evidence.  Although he alleges Fire Marshal Geraci made an ambiguous and seemingly inappropriate comment to Mr. Chapman about Mr. Chapman's Black History Month email, (*see* J.A. 11); *see also* Appellant's Br. 8, 22, this alleged conversation was never documented by anyone involved and there is no evidence—other than Mr. Chapman's own self-serving assertion—to support that it even took place.  What is documented, however, is that both Fire Marshal Geraci and Chief Der thanked Mr. Chapman for sharing the email.  (J.A. 136-137.)  In fact, Mr. Chapman admitted he did not complain about the alleged comment for over a year, confirming that even if Fire Marshal Geraci actually made the comment, it was well before Mr. Chapman suffered the allegedly adverse actions in 2021.  (J.A. 362-363.)  Stray or isolated remarks are insufficient to establish a direct evidence claim. *See Johnson v. United Parcel Service, Inc.* 839 Fed. App'x 781, 783 (4th Cir. 2021) (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010)).

17

**A.** **The District Court Correctly Concluded That Mr. Chapman Failed to Establish a Prima Facie Case of Race or Color Discrimination Because He Cannot Show Satisfactory Job Performance or That He was Subjected to Disparate Treatment.**

To establish a prima facia case of discrimination, Mr. Chapman must show (1) that he is a member of a protected class, (2) that he had satisfactory job performance at the time of the alleged discrimination, (3) that he suffered an adverse employment action, and (4) that similarly situated employees outside of his class were treated differently. *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). In this case, Mr. Chapman cannot satisfy either the second or fourth element.[6]

---

[6] Contrary to Mr. Chapman's assertions, *see* Appellant's Br. 15, 22-23, the Office never conceded that he suffered adverse actions under Title VII, especially since all of the actions in question were brought on by his own conduct. (J.A. 428-432); *see also Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (refusing to consider the repercussions of a disciplinary investigation as adverse actions under Title VII and holding that "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from a state agency's disciplinary procedures").

1. **The District Court Correctly Found That Mr. Chapman Failed to Demonstrate Satisfactory Job Performance Because He Failed to Satisfy His Employer's Legitimate Expectations.**

The undisputed record shows that Mr. Chapman consistently failed to perform an essential function of his position: ensuring that he and his subordinates timely submit fire origin reports. Therefore, the district court properly found that Mr. Chapman could not establish satisfactory job performance.

To demonstrate a satisfactory job performance, Mr. Chapman must show that he was meeting the Office's legitimate expectations. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). Importantly, "it is the perception of the decision-maker that is relevant, not the self-assessment of [Mr. Chapman]." *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). Differences of opinion, coupled with conclusory allegations of racism, cannot reasonably support a finding of discriminatory animus. *See id.* at 281. In other words, the "[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races." *Id.* at 282 (citing *Johnson v. Merrell Dow Pharms., Inc.*, 965 F.2d 31, 34 (5th Cir.1992) ("[T]o properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees.")).

Here, the record is rife with evidence that Mr. Chapman consistently failed to meet the Office's expectations. Mr. Chapman even admits that timely submitting

fire origin reports was a basic and essential function of his role, and that he was not up for the task.  (J.A. 84-87, J.A. 91.)  Indeed, he maintained a backlog of delinquent reports for more than four years after his 2018 promotion, despite assuring his command that he would remedy the issue.  (J.A. 91-93, J.A. 110.)

The Office gave Mr. Chapman numerous opportunities to reduce his backlog and avoid discipline.[7]  The Office made clear to Mr. Chapman that timely completing the reports was of the "utmost importance" (J.A. 151), and that a failure to resolve the backlog would result in "progressive disciplinary measures" (J.A. 168-169).  At one point, the backlog became so unwieldy that Chief Der even reduced Mr. Chapman's reporting requirement to only ten reports per month.  (J.A. 147.)  But even then, Mr. Chapman still could not meet the Office's expectations.  (*See* J.A. 172 (advising that Mr. Chapman failed to meet his monthly metrics and that he failed to submit the specific reports requested).)

By the time the Office temporarily reassigned Mr. Chapman to Headquarters to focus solely on reducing the backlog, the total number of delinquent reports for Mr. Chapman and NERO was over three times higher than the next highest region, which also totaled more than all the other regions combined.  (J.A. 207.)  Unlike

---

[7] Mr. Chapman received no less than 12 communications about the delinquent reports, starting from 2018 until his suspension in August of 2021.  (J.A. 112-113, J.A. 119, J.A. 128, J.A. 131-132, J.A. 138-151, J.A. 167-169.)

previous fire marshals who used their temporary reassignment to successfully reduce their backlog, Mr. Chapman remained behind on his reports. (J.A. 110.) As a result, Chief Der issued Mr. Chapman a written counseling, and the Office later charged Mr. Chapman with misconduct, and investigated and suspended him with pay. (J.A. 169, J.A. 174-175, J.A. 182-212.) Mr. Chapman subsequently pleaded guilty to these charges and accepted the Office's recommended punishment.[8] (J.A. 237-242.)

Although Mr. Chapman points to a single "satisfactory" performance review in 2019 to argue that he was meeting expectations, *see* Appellant's Br. 21, that review took place years before the Office initiated any disciplinary measures against him. As such, Mr. Chapman's 2019 performance evaluation is irrelevant to whether he had satisfactory job performance at the time the Office took corrective action against him in 2021. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir.1995), *rev'd on other grounds*, 517 U.S. 308 (1996) (holding that satisfactory job performance must be evaluated *at the time* of the alleged adverse action). Mr. Chapman also provides no support to his claim that overdue reports were a "statewide issue." *See* Appellant's Br. 20, 24. Even if that were true, it would

---

[8] Mr. Chapman's guilty plea to his misconduct charges—which he voluntarily entered while represented by counsel—should foreclose him from claiming it as an adverse action. He admitted to the very conduct underlying the disciplinary action.

not reverse his unsatisfactory job performance or insulate him from discipline.  *See Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) (rejecting plaintiff's claim that the type of misconduct he engaged in was a widespread practice).  Mr. Chapman cannot create a dispute of fact simply by testifying that he had performed satisfactorily, especially without providing any additional evidence.  *See Haynes*, 922 F.3d at 224 n.1 (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).

The undisputed record clearly establishes that Mr. Chapman had a perpetual and pervasive backlog of overdue reports.  (*See* J.A. 221 (admitting to not completing the overdue reports).)  Mr. Chapman even agrees that this amounted to a failure to perform his essential job functions.  (J.A. 84-87, J.A. 91.)  But most telling of all is that Mr. Chapman's replacement, Deputy Chief Hodges, was able to reduce NERO's backlog from 239 overdue reports to 38 in less than six months.  (J.A. 102, J.A. 244, J.A. 245.)  Therefore, there is no genuine dispute that Mr. Chapman failed to meet the Office's expectations as a Deputy Chief Fire Marshal and cannot establish satisfactory job performance.

**2. The District Court Correctly Found That Mr. Chapman Failed to Sufficiently Identify Similarly Situated Comparators to Support His Disparate Treatment Claim.**

Mr. Chapman failed to identify proper comparators who engaged in similar misconduct but were treated differently. The district court, therefore, properly found that Mr. Chapman failed to demonstrate that he was subject to disparate treatment.

Because Mr. Chapman relies on comparator evidence to establish his discrimination claims, he must show that he and his comparators were similarly situated in all relevant respects. *Swaso v. Onslow County Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017); *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). "To that end, [Mr. Chapman] must prove that [he] and [his identified] comparator[s] 'dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct *without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it*.'" *Haynes*, 922 F.3d at 223-24 (emphasis added). Thus, the seriousness or severity of their respective offenses is crucial to establishing a meaningful comparison. *See Cosby v. South Carolina Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (citing *Lightner*, 545 F.3d at 265); *see also Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).

For comparators, Mr. Chapman points to Deputy Chiefs Mowbray and Nelson, claiming that they, too, had overdue reports. *See* Appellant's Br. 11, 24-25.

And, although he does not identify them as comparators on appeal, Mr. Chapman asserts in his complaint that Deputy Chiefs Stevens and Cohen also had backlogs but were not disciplined.  (*See* J.A. 18.)  None of these regional commanders, however, ever allowed themselves, or their subordinates, to fall as far behind as Mr. Chapman, or for as long.  In fact, their numbers rarely—if ever—crept into the double digits; and if overdue reports were brought to their attention, they promptly resolved the issue.  (*See* J.A. 110, J.A. 249, J.A. 251-252.)

Mr. Chapman also cites to one of his interrogatory answers in which he lists the names of 33 individuals who, he claims, also had overdue reports but received no discipline.  (J.A. 405-406.)  But Mr. Chapman offers absolutely no detail— whether before the district court or now on appeal—as to how many overdue reports these individuals had, or for how long.  Nor does he offer any evidence that these individuals held the same rank, answered to the same supervisor, or were subject to the same standards.  Rather, Mr. Chapman merely lists their names and states "overdue reports." (J.A. 405-406.)  Of particular import, this list may constitute yet another admission by Mr. Chapman that he failed to meet the Office's expectations, because many of these individuals were Mr. Chapman's own subordinates while he was the commander at NERO.  (*Compare* J.A. 405-406 *with* J.A. 207.)  Further, at least one individual Mr. Chapman identifies as receiving more favorable treatment, despite having late reports, actually falls within Mr. Chapman's protected class. (*See*

24

J.A. 405-406 (listing Dexter Hodges as a black male with overdue reports).) This concession, alone, should dispel Mr. Chapman's claim that the Office treated only white officers more favorably.

Finally, Mr. Chapman's reliance on *Haynes* and *Swaso* to claim that he has sufficiently evinced disparate treatment to survive summary judgment is misplaced. *See* Appellant's Br. 23-27. In *Haynes*, the court found disparate treatment because the employer treated the plaintiff's comparator better than the plaintiff, despite that the comparator engaged in similar but more egregious misconduct than the plaintiff. *See Haynes*, 922 F.3d at 222, 224-25. Here, Mr. Chapman cannot identify a single individual whose alleged misconduct remotely rivals the severity of his offenses. And he provides no evidence that any of his identified comparators also engaged in the other misconduct Mr. Chapman was charged with, *i.e.*, failing to supervise his subordinates and disobeying a direct order. (*See* J.A. 237-242 (detailing Mr. Chapman's misconduct charges).)

*Swaso* is also inapposite because the court in that case was tasked with evaluating the sufficiency of the plaintiff's complaint. *See Swaso*, 698 F. App'x at 747. In contrast, here on summary judgment, Mr. Chapman's claims cannot rest on mere allegations; he must instead set forth specific facts showing a genuine issue for trial. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003); *see also Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)

("[A] party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'").  In this regard, Mr. Chapman has failed to establish any genuine issues for trial.

Ultimately, Mr. Chapman fails to offer any admissible evidence that his identified comparators were similarly situated.  Instead, he merely alleges that his comparators had "overdue" reports without any verifiable detail.  *See* Appellant's Br. 20; (J.A. 405-406.)  Such broad generalizations simply cannot "show sufficient similarity to meet [his] burden under Title VII."  *Spencer v. Virginia State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).  Accordingly, Mr. Chapman failed to identify similarly situated comparators to support his claim for disparate treatment.

> **B.    The District Court Correctly Concluded That Mr. Chapman Failed to Establish a Prima Facie Case of Retaliation Because He Cannot Show That the Office's Corrective Actions Are Causally Connected to His Protected Activity.**

Since Mr. Chapman's progressive discipline predates any of his claimed protected activities, and because there is insufficient temporal proximity to infer a causal nexus, the district court correctly held that he failed to establish a prima facie case of retaliation. To establish a prima facie case of retaliation under Title VII, Mr. Chapman must show (1) that he engaged in a protected activity, (2) that he suffered an adverse employment action, and (3) that the two events are causally connected. *Coleman*, 626 F.3d at 190; *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015).  Similar to a Title VII discrimination claim, if Mr. Chapman

26

successfully establishes a prima facie retaliation claim, the burden then shifts to the Office to provide a legitimate, non-discriminatory reason behind its alleged employment action. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). If that happens, then Mr. Chapman must show that the proffered reason is pretextual and that he would not have suffered the adverse action "but for" having engaged in the protected activity. *See Phillips v. New Millennium Bldg. Sys., LLC*, No. 20-2095, 2022 WL 2188405, at *2 (4th Cir. June 17, 2022) (citation omitted).

In this case, Mr. Chapman challenges the district court's conclusion that he failed to establish a causal connection between his protected activity and his reassignment, investigation, suspension, and discipline. More specifically, he asserts that the Office retaliated against him for raising concerns about race relations in March of 2021, and for filing his fair practices complaint on June 15, 2021. *See* Appellant's Br. 31; (J.A. 25.)

"To establish a nexus, a plaintiff can either show a temporal proximity between the protected activity and adverse action, or that other relevant evidence indicates 'continuing retaliatory conduct and animus' toward the plaintiff." *Alberti v. Rector & Visitors of the Univ. of Virginia*, 65 F.4th 151, 156 (4th Cir. 2023) (citation omitted). "Although there is no 'bright-line rule' for when temporal proximity helps or hurts a cause of action for retaliation," the time between an employer's knowledge of the protected activity and the allegedly adverse

employment action must be "*very close.*" *Laurent-Workman v. Wormuth*, <u>54 F.4th 201, 219</u> (4th Cir. 2022) (emphasis added) (citing *Clark County Sch. Dist. v. Breeden*, <u>532 U.S. 268, 273</u> (2001)).

Without independent evidence or documentation, Mr. Chapman alleges that he first engaged in a protected activity on March 21, 2021, when he supposedly met with Chief Der and Fire Marshal Geraci to express concerns over race relations within the Office. *See* Appellant's Br. 12; (*see also* <u>J.A. 12</u>, <u>J.A. 414</u>.) The Office, however, did not reassign Mr. Chapman to headquarters to catch up on overdue reports until three months later on June 16, 2021. (<u>J.A. 157-158</u>.)

To that end, Mr. Chapman maintains that the district court improperly concluded that a three-month gap between his March 2021 meeting and his temporary reassignment was too attenuated to support any inference of retaliation. Mr. Chapman relies on *Roberts v. Glenn Indus. Grp., Inc.* to contend that establishing a prima facie retaliation case requires very little evidence, *see* Appellant's Br. 28-29 (citing *Roberts*, <u>998 F.3d at 126</u>).

In *Roberts*, however, this Court specifically held that three months—and even two months—is too long to establish a causal connection, especially in cases in which a plaintiff or appellant cannot provide any other evidence supporting that the employer had any knowledge of the protected activity or acted with racial animus. *Roberts*, <u>998 F.3d at 127</u> ("This Court has also found that, absent other evidence of

28

a causal relationship, a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation." (citing *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (quotations omitted)); *see also Laurent-Workman*, 54 F.4th at 219 (finding a two-month temporal gap sufficiently undercuts inference of retaliation).

Furthermore, Mr. Chapman's reliance on *Lettieri v. Equant Inc.* to aver that he sufficiently overcame his three-month gap by showing a continuous pattern of mistreatment falls equally flat. *See* Appellant's Br. 32 (citing *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)). Not only does Mr. Chapman ignore the corrective measures that the Office already put in place to deal with his backlog, but he later contradicts this argument by conceding in his brief that his June 15, 2021 reassignment is the only identifiable adverse action that chronologically follows his meeting with Chief Der and Fire Marshal Geraci. *See* Appellant's Br. 31. Thus, this "lack of temporal proximity only serves to undercut what was already a speculative causal connection." *Roberts*, 998 F.3d at 127.

Similarly, Mr. Chapman cannot establish a causal connection with respect to his fair practices complaint, because the Office had already begun implementing active measures to remedy his overdue reports long before he filed the complaint. (*See* J.A. 91-93, J.A. 112-113.) An employee who is in the midst of being subjected to progressive supervision and discipline cannot file a complaint after the process

29

has begun and then claim retaliation. *See Francis v. Booz, Allen, & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted). Notably, Mr. Chapman explicitly concedes that the situation with his overdue reports "began to deteriorate" after Chief Der was promoted in 2017. *See* Appellant's Br. 7.

The record leaves no room to dispute that the Office began addressing Mr. Chapman's performance deficiencies before he filed his fair practices complaint. The Office sent Mr. Chapman more than eight communications about his backlogged reports before he ever filed (*see* J.A. 112-119, J.A. 128, J.A. 131-132, J.A. 138-151, J.A. 167-169), and some of those communications expressly advised Mr. Chapman that his failure to reduce the backlog would subject him to corrective action or progressive discipline (*see* J.A. 107, J.A. 151). These communications continued even after Mr. Chapman filed his complaint. (*See* J.A. 168-171.) Moreover, Mr. Chapman readily admits that he filed his fair practices complaint the day before his temporary reassignment because he "felt it was coming." (J.A. 230, J.A. 253-261.) This Court has routinely rejected similar attempts to manipulate the complaint process. *See*, *e.g.*, *Francis*, 452 F.3d at 309 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Bullock v. Kendall*, No. 21-2111, 2022 WL 2828221, at *2 (4th Cir. July 20, 2022); *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th

Cir. 2021); *McDougald v. Quad/Graphics Mktg., LLC*, 744 F. App'x 839, 840 (4th Cir. 2018).

"[T]o survive a motion for summary judgment, [Mr. Chapman] must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." *Mackey v. Shalaba*, 360 F.3d 463, 469 (4th Cir. 2004).  But the undisputed facts establish that the Office took progressive disciplinary measures against Mr. Chapman for unsatisfactory job performance, and these efforts easily predate any of Mr. Chapman's alleged protected activity.  Moreover, Mr. Chapman offers no direct evidence to support his claim that Chief Der or Fire Marshal Geraci acted with retaliatory animus.  The district court, therefore, properly found that Mr. Chapman failed to establish a prima facie case of retaliation.

## III.    Even if Mr. Chapman Could Establish Prima Facie Discrimination and Retaliation Claims, the District Court Correctly Held That He Failed to Show That the Office's Legitimate, Non-Discriminatory Reasons for Its Actions Were Pretextual.

Mr. Chapman failed to provide sufficient evidence to rebut the Office's legitimate, non-discriminatory reasons behind his reassignment, investigation, suspension, and discipline.  All the examples that Mr. Chapman relies upon to show pretext are either directly refuted by his own admissions, or are far too attenuated from the alleged adverse actions in this case to be relevant or material.  Therefore,

31

even if, *arguendo*, Mr. Chapman could establish prima facie discrimination and retaliation claims, the district court correctly held that he failed to demonstrate that the Office's proffered reasons were pretextual.

To establish a pretext, a plaintiff must show that an employer's proffered reason behind the allegedly unlawful employment action is "unworthy of credence," and that the true reason was based on discriminatory or retaliatory motive. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). This can be done by identifying employer justifications that are either false or inconsistent, or ones that change over time, such as late or post-hoc rationales. *See Haynes*, 922 F.3d at 225 (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001)).

Most importantly, Mr. Chapman must show that his race, color, or status for having engaged in a protected activity was the "but-for" cause of the alleged discrimination or retaliation. *See Phillips*, 2022 WL 2188405, at *2; *Cole v. Family Dollar Stores of Md., Inc.*, 811 F. App'x 168, 174 (4th Cir. 2020). Even if this Court agrees that Mr. Chapman's actions merited discipline, the analysis does not require it to determine whether the Office's reasoning was "wise, fair, or even correct, . . . so long as it truly was the reason for the plaintiff's [adverse employment action]." *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 722-23 (4th Cir. 2002); *see also Alberti*, 65 F.4th at 156 n.4 ("Title VII should not be interpreted as a general civility code for the American workplace." (citations and quotations omitted)).

32

As an initial matter, Mr. Chapman does not dispute that he consistently maintained a significant backlog of delinquent reports. He even admitted under oath that he believed the total number of overdue reports reflecting in his records actually "could have been more." (J.A. 327-328.) Thus, Mr. Chapman concedes the validity of the very reason behind his reassignment and eventual discipline. Furthermore, although courts permit inferences of pretext in cases where an employer has made substantial changes to its proffered reason for the adverse employment action, *see Haynes*, 922 F.3d at 225, such circumstances simply are not present in this case. In other words, the Office's reason for Mr. Chapman's reassignment, investigation, suspension, and eventual discipline has not changed. Since at least 2018, the Office's reason for Mr. Chapman's reassignment and progressive discipline has been and continues to be his unsatisfactory job performance; namely, his continuous backlog of delinquent fire origin reports.

Next, Mr. Chapman asserts that the Office wrongfully denied him the overtime and additional resources needed to fulfill his reporting metrics. *See* Appellant's Br. 13. He admitted at his deposition, however, that he was already working overtime (J.A. 438), and he acknowledged that the Office was generally limiting the amount of overtime afforded to all employees because of recent public pushback (J.A. 339). Mr. Chapman also provides no independent evidence to

33

identify who denied his requests for overtime and additional resources or when any of his requests were allegedly denied.

Mr. Chapman also claims that Deputy Chief Fire Marshals Duane Svites and Caryn McMahon made racially insensitive remarks at an unspecified staff meeting. *See* Appellant's Br. 12, 14. Mr. Chapman, however, offers no detail as to when the specific meeting or meetings occurred, nor does he offer any evidence to support that Deputy Chiefs Svites or McMahon had any involvement in the decision to reassign or discipline Mr. Chapman for his overdue reports. In reality, the undisputed evidence in this case shows that, even if any of these alleged incidents did occur, they happened long before the Office took any corrective action against Mr. Chapman.[9]

Finally, although Mr. Chapman frequently cites to a letter that he purportedly sent the National Black Caucus in November of 2021, *see* Appellant's Br. 10, 12,

---

[9] For instance, the Office's investigation into Deputy Chief Svites for allegedly "targeting black businesses" took place while William Barnard was the State Fire Marshal, which means that the complaint and investigation occurred at least nine years before Mr. Chapman's reassignment or discipline. (J.A. 195, 346); *see also Barnard Retires as Maryland State Fire Marshal*, THE BALTIMORE SUN, Aug. 19, 2013, https://www.baltimoresun.com/2013/08/19/barnard-retires-as-maryland-state-fire-marshal/ (last visited Feb. 24, 2025). Likewise, the record shows that the altered photograph of then-Vice President Joseph Biden was allegedly circulated via email somewhere between 2008 and 2011. (*Compare* J.A. 383-384 *with* J.A. 412.)

26, 31, that letter provides nothing more than the kind of self-serving, uncorroborated assertions that this Court has repeatedly rejected. *See Evans*, 80 F.3d at 962; *Williams*, 370 F.3d at 433; *Bouchat*, 346 F.3d at 526. Here, Chapman offers no evidence to support that the decision-makers at the Office knew about this letter before taking any adverse action, nor does he provide any evidence to support that this letter was the sole reason behind his reassignment and eventual discipline. Claims about an employer's general or universal knowledge are not enough. *See Ortiz v. Baltimore Police Dep't*, No. CV SAG-22-1396, 2024 WL 4287999, at *6 (D. Md. Sept. 25, 2024) ("speculation about universal knowledge does not suffice").

To that end, general allegations without some sort of independent corroborating evidence are insufficient to establish a pretext or to create a material dispute of fact to survive summary judgment. *See Beale*, 769 F.2d at 214. Likewise, pretext will not be inferred where gradual adverse job actions began well before a plaintiff ever engaged in any protected activity. *See Francis*, 452 F.3d at 309; *see also Perry v. Kappos*, 489 F. App'x 637, 643-44 (4th Cir. 2012) ("[S]ave for situations in which the adverse employment decision follows the protected activity 'very close[ly],' 'mere temporal proximity' between the two events is insufficient to satisfy the causation element of the prima facie requirement." (quotations and citations omitted)).

At best, Mr. Chapman's claims are factually unsupported and, at worst, they are disproven by his own actions and admissions. Mr. Chapman's case simply cannot proceed on unsubstantiated, self-serving accounts. *See Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994) (finding testimony about discriminatory behavior that "is not substantiated by accounts of specific dates, times or circumstances" insufficient to support plaintiff's disparate discipline claim). Thus, the district court correctly found that Mr. Chapman failed to demonstrate that the Office's legitimate, non-discriminatory reasons behind its employment actions were pretextual.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ _____
KYLE A. ASHE
PHILLIP M. PICKUS
Assistant Attorneys General
Office of the Attorney General
1201 Reisterstown Road, Bldg. A
Pikesville, Maryland 21208
410-653-4293 (telephone)
kyle.ashe@maryland.gov
phillip.pickus@maryland.gov

*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this motion contains 9,350 words, excluding the parts of the motion exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point, Times New Roman.

/s/_____
Kyle A. Ashe


## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2025, the foregoing Brief of Appellee the Maryland Department of State Police Office of State Fire Marshal was served on all counsel of record via the Court's electronic filing system.

/s/_____
Kyle A. Ashe